J-S27029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: A.G., MINOR,   :   IN THE SUPERIOR COURT OF
ADJUDICATED DEPENDENT             :         PENNSYLVANIA
                                   :
                                   :
                                   :
                                   :
                                   :
                                   :
                                   :
APPEAL OF: K.G., NATURAL FATHER    :   No. 1556 WDA 2018

Appeal from the Decree Entered September 26, 2018
In the Court of Common Pleas of Erie County
Orphans' Court at No(s):  66B of 2018

BEFORE:   OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OTT, J.:                    **FILED AUGUST 15, 2019**

K.G. ("Father") appeals from the decree entered September 26, 2018, which terminated involuntarily his parental rights to his minor child, A.R.G., a female born in February 2018 ("Child").[1]  After careful review, we affirm.

The record reveals that the Erie County Office of Children and Youth ("OCY") became involved with this family in March 2017, around the time that Child's older brother, W.B.G., was born.  N.T., 8/17/18, at 107.  Mother had tested positive for opiates several days prior to W.B.G.'s birth.  *Id.*  She then tested positive for benzodiazepines, opiates, and marijuana on the day he was born.  *Id.*  W.B.G. suffered from drug withdrawal symptoms, which required

---

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court entered a separate decree terminating the parental rights of N.L.S. ("Mother") involuntarily.  We address Mother's appeal in a separate memorandum.

monitoring at the hospital for five days. *Id.* at 107-08. Father also admitted to drug use and neither parent provided appropriate care for W.B.G. while he remained in the hospital. *Id.* at 45, 108. The parents did not attempt to care for W.B.G. when he cried, and left the hospital for extended periods. *Id.* Due to safety concerns, the hospital staff removed W.B.G. from Mother's room. *Id.* OCY obtained emergency protective custody of both W.B.G. and Child's older sister, K.N.G., born in November 2014, and the juvenile court entered shelter care orders. The court adjudicated W.B.G. and K.N.G. dependent on March 29, 2017.

Father initially received reunification services from Corry Counseling's Family Preservation program. *Id.* at 45, 50-51. Father failed to attend the program consistently. *Id.* at 46. Further, Father was not receiving visits with W.B.G. and K.N.G., due to his positive drug screens. *Id.* at 47, 54, 119, 128. Because of these circumstances, Corry Counseling was unable to assist Father and discharged him on September 12, 2017. *Id.* at 47. He received additional reunification services through the Time Limited Family Reunification program beginning on December 20, 2017. *Id.* at 58.

OCY referred Father to the Erie County Family Dependency Treatment Court. *Id.* at 73. Father failed to attend his orientation in June 2017. *Id.* The program rescheduled Father's orientation for July 2017 and he attended. *Id.* at 74. However, the program rejected Father due to his failure to participate consistently in drug screens and comply with drug and alcohol

treatment services. *Id.* at 75. Father's compliance with services subsequently appeared to improve and Treatment Court accepted him on January 5, 2018. *Id.* at 76. Once again, Father failed to attend his first scheduled appearance. *Id.* at 81. Treatment Court also discovered that Father had become noncompliant with his drug and alcohol treatment at Gaudenzia and needed to write a letter to reenter the program. *Id.*

In February 2018, Father's progress declined dramatically. *Id.* at 78. Mother gave birth to Child prematurely, at which time she tested positive for opiates, benzodiazepines, and cocaine. *Id.* at 32, 78, 114-16. In addition, Father admitted that he had relapsed at the same time as Mother. *Id.* at 114. OCY caseworker, Stephanie Mumford, reported that she met with Father at the hospital and that he had "glazed eyes, a blank expression on his face, and nothing to say when I did discuss the removal of the child." *Id.* at 116. When Ms. Mumford spoke to Father later, "he didn't even remember that I was at the hospital to visit him with the child." *Id.* The juvenile court removed Child from Father's care and entered a shelter care order. The court adjudicated Child dependent on March 7, 2018.

Following his relapse and Child's birth, Father proposed that he should attend treatment at ARS. *Id.* at 78. Treatment Court informed him that ARS

was not an acceptable program.[2]  *Id.*  Nonetheless, Father ignored Treatment Court's instructions and attended ARS.[3]  Petitioner's Exhibit 14 (Treatment Court reports).  Father's participation in Treatment Court was sporadic.  N.T., 8/17/18, at 82.  Father did well at times, "but towards the end" became noncompliant.  *Id.*  In May 2018, Father simply stopped attending Treatment

---

[2] OCY caseworker and Treatment Court liaison, Kristen Heise, testified that the ARS program was not acceptable because "[t]hey don't provide the appropriate counseling that we would like to see. . . . [W]hat they do is they give you a 30-day script [for Suboxone] and send you on your way."  N.T., 8/17/18, at 79.

[3] In addition, Father received a referral in February 2018 to the Center of Excellence at Esper Treatment Center for further drug-and-alcohol-related services.  N.T., 8/17/18, at 7.  According to the Center care manager, Nicole Corbitt, the purpose of these services is to "ensure effective coordination integrating physical, [and] behavioral needs for every patient with an opioid use disorder."  *Id.*  Moreover, the Center "increase[s] access to medication assisted treatment, including Methadone, Suboxone, and Vivitrol."  *Id.*  The Center made contact with Father several days after the referral but he refused services.  *Id.* at 8.  He did not agree to participate until March 2018.  *Id.* at 9.  Father appeared at his first session at the Center three hours and forty-five minutes late.  *Id.*  He agreed to return to the Center for further services but never did so.  *Id.* at 10.  The Center then attempted to contact Father "on numerous occasions" without success.  *Id.* at 11.  Finally, Father made contact on April 3, 2018 and scheduled an appointment for April 11, 2018, to begin medically assisted treatment.  *Id.*  He failed to appear for his appointment.  *Id.* at 11-12.  The Center attempted to call Father three times without success before discharging him later in April.  *Id.* at 12.  Even after discharging Father, the Center continued attempting to contact him.  *Id.*  The Center made contact with Father on May 1, 2018, and scheduled yet another appointment for May 18, 2018.  *Id.*  He failed to appear.  *Id.*  The Center made three more attempts at contacting Father in June 2018, all of which were unsuccessful.  *Id.* at 13.  The Center discharged Father for a second time on June 20, 2018.  *Id.*

Court. *Id.* The program discharged Father in June 2018. Petitioner's Exhibit 14.

At approximately the same time, on February 27, 2018, Father resumed attending outpatient treatment at Gaudenzia. N.T., 8/17/18, at 32. Father did not attend four of his thirteen or fourteen scheduled sessions and lacked "motivation and insight into the severity of his addiction and his need for follow-up treatment[.]" *Id.* at 33, 38. He "often presented with ambivalence and wanted to focus more on how he hates OCY and treatment court[.]" *Id.* at 34. The program discharged Father due to noncompliance on May 29, 2018. *Id.* at 32.

As Father's progress toward sobriety deteriorated, so too did the other circumstances of his life. Father informed OCY that he was going to become homeless and that he would be staying with Mother's parents. *Id.* at 117-18. Troublingly, Father also reported that he would likely relapse if he had to stay with Mother's parents. *Id.* at 118. Father was evicted from his residence on May 17, 2018, due to nonpayment of rent. *Id.* at 122. Father also failed to attend his paternity testing for Child[4] and then failed to attend the contempt hearing that followed. *Id.* at 120-21. As a result, Father incurred a bench

_____

[4] Despite Father's failure to appear at the paternity test, it is undisputed that he is Child's father. N.T., 8/17/18, at 120.

warrant.[5]  *Id.*  The juvenile court changed Child's permanent placement goal to adoption on June 1, 2018.  Following the goal change, Time Limited Family Reunification ended services with Father and his visitation with Child ceased. *Id.* at 60, 152.

On June 22, 2018, OCY filed a petition to terminate Father's parental rights to Child involuntarily.  The orphans' court held a termination hearing on August 17, 2018, and September 21, 2018.[6]  On September 26, 2018, the court entered a decree terminating Father's rights.  Father timely filed a notice of appeal on October 26, 2018, along with a concise statement of errors complained of on appeal.

Father raises the following claims for our review:

1. Did the [orphans' c]ourt abuse its considerable discretion or commit an error of law when it ruled that the goal of "Adoption" should be abandoned in favor of terminating the parental rights of

_____

[5] Father was facing various summary charges as well.  N.T., 8/17/18, at 123; Petitioner's Exhibit 19 (Magisterial District Judge docket).

[6] The orphans' court appointed Catherine Allgeier, Esquire, to serve as Child's legal counsel.  Attorney Allgeier also served as Child's guardian *ad litem* during the dependency proceedings.  The record demonstrates that Child was seven months old at the time of the termination hearing.  Thus, Child was too young to state her preferred outcome in this case.  *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that a guardian *ad litem* may represent both a child's legal and best interests so long as the two interests do not conflict, and that no conflict can exist when a child is very young and pre-verbal, and his or her preference is incapable of ascertainment).  Attorney Allgeier supported termination of Father's rights during the hearing.  N.T., 9/21/18, at 5.  She did not file a brief on appeal but did submit a letter repeating her support for termination and joining the brief that OCY filed in Mother's appeal.

[Father] even though he continued to make efforts to work [on] a treatment plan in efforts to reunify with his daughter, [Child]?

2. Did the [orphans' c]ourt abuse its considerable discretion or commit an error of law when it ruled that the goal of "Adoption" should be abandoned in favor of terminating the parental rights of [Father] under section (a)(6) that [F]ather failed to rectify the conditions under which the child was adjudicated, when the [c]ourt unilaterally chose not to follow the time limit of four (4) months prior to make any change in goal for this particular child, [Child]?

3. Did the [orphans' c]ourt commit an abuse of discretion in ruling that the termination of the father's rights as parent under section (b) would be in the best interest of the child?

Father's brief at 3 (suggested answers omitted).[7]

We review Father's claims in accordance with the following standard of

review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

[7] While Father references Child's goal change in his statement of questions involved, and states briefly in the argument section of his brief that it was improper for the juvenile court to change Child's goal, he does not develop this argument with citation to relevant authority. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority[.]"). We also observe that Father did not appeal the goal change order.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

Section 2511 of the Adoption Act governs involuntary termination of

parental rights.  *See* 23 Pa.C.S.A. § 2511.  It requires a bifurcated analysis:

> . . . . Initially, the focus is on the conduct of the parent.  The party
> seeking termination must prove by clear and convincing evidence
> that the parent's conduct satisfies the statutory grounds for
> termination delineated in Section 2511(a).  Only if the court
> determines that the parent's conduct warrants termination of his
> or her parental rights does the court engage in the second part of
> the analysis pursuant to Section 2511(b): determination of the
> needs and welfare of the child under the standard of best interests
> of the child.  One major aspect of the needs and welfare analysis
> concerns the nature and status of the emotional bond between
> parent and child, with close attention paid to the effect on the child
> of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights to

Child pursuant to Sections 2511(a)(2), (6), and (b).  We need only agree with

the court as to any one subsection of Section 2511(a), as well as Section

2511(b), to affirm.  *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en

banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).  Here, we analyze the court's

decision to terminate pursuant to Sections 2511(a)(2) and (b), which provide

as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may
> be terminated after a petition filed on any of the following
> grounds:

***

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> \*\*\*

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

> \*\*\*

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by considering whether the orphans' court committed an abuse of discretion by terminating Father's parental rights pursuant to Section 2511(a)(2):

> . . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot

be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

The orphans' court found that Father has an extensive history of drug abuse and that he failed to cooperate with services aimed at addressing his addiction for nearly a year preceding Child's birth. Orphans' Court Opinion, 12/6/18, at 9. The court observed that Father remained noncompliant with services even after Child's birth, which established overwhelmingly that he would not remedy his drug addiction. *Id.* at 9-10. The court also observed that Father was evicted from his home for failure to pay rent, and struggled to pay fines resulting from his criminal charges, which confirmed that he would not be able to provide for Child financially. *Id.* at 10. The court concluded:

> [Father] has continuously demonstrated he cannot or will not place his children's needs above his own. He refuses to accept responsibility for his actions. The skills and judgment necessary to provide for the emotional well-being of his child remain problematic. [Father] has consistently shown since March 2017, that he will not avail himself to the services offered to help him reunite with his children. The circumstances which led to the placement of the children have not been alleviated. [Father] was given numerous opportunities to demonstrate he would work to be able to provide the necessary basic needs for his child and repeatedly failed to do so. . . .

*Id.* at 10-11.

Father argues that the orphans' court abused its discretion or committed an error of law because he was making progress toward complying with his

drug and alcohol treatment plan. Father's brief at 8-9. He acknowledges that he put forward an "abysmal performance" after W.B.G. and K.N.G. entered foster care in March 2017, but insists that he was largely compliant during the following winter and the spring of 2018. *Id.* at 9. Father stresses that he did not test positive for any illegal substance during 2018 and that he held employment. *Id.* at 9-10. Father also contends that the court terminated his parental rights too quickly, as it entered its decree only seven months after Child's birth. *Id.* at 8.

We discern no abuse of discretion. As Father concedes, his performance after OCY removed W.B.G. and K.N.G. in March 2017 was abysmal. Father failed to comply with services throughout the remainder of the year. He then relapsed as recently as February 2018, when Child was born. After Father's relapse, his compliance with services remained deficient. He failed to comply with Treatment Court, outpatient treatment at Gaudenzia, and the Center for Excellence. Meanwhile, Father was evicted from his housing and incurred a bench warrant for failing to attend a contempt proceeding. Father is correct that, after his relapse, he tested positive for alcohol and Suboxone only, and that he reportedly received a prescription for Suboxone through ARS.[8] What

---

[8] During the hearing, Ms. Heise detailed Father's history of drug screens. N.T., 8/17/18, at 84. Between April 13, 2017 and February 12, 2018, Father was unable to produce sufficient urine to provide a screen on five occasions. *Id.* From March 2017 until June 4, 2018, Father failed to attend sixty-one screens. *Id.* Father produced fifty-one positive screens between March 2017 and May

Father does not acknowledge is that he also failed to attend several of his drug screens, including those on May 25, 2018, May 29, 2018, May 31, 2018, and June 4, 2018. Petitioner's Exhibit 12 (drug screen results). At best, Father's drug screen results suggest that he had managed to avoid illegal substances for a mere seven months at the time of the hearing. Father's brief period of sobriety does not excuse his failure, or even outright refusal, to comply with services, nor does it excuse his inability to maintain housing and avoid legal troubles.

In addition, while Father protests that Child had only been out of his care for seven months at the time the orphans' court terminated his parental rights, we cannot view Child's short dependency in a vacuum. By the time of the termination hearing, Father had received the benefit of numerous services over the course of a year and a half. Father's failure to comply with services and maintain sobriety for any significant length of time demonstrates that he will be at a high risk for future relapses, and that he will not be able to achieve the maturity and stability necessary to care for Child in the foreseeable future. As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's

---

21, 2018. *Id.* From June 1, 2017, until March 13, 2018, Father produced forty-eight negative screens. *Id.* Two screens leaked in transit on July 18, 2017, and May 4, 2018, and one screen was damaged in transit on February 9, 2018. *Id.*

need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006). The record supports the conclusion of the orphans' court that Father is incapable of parenting Child and that he cannot or will not remedy his parental incapacity pursuant to Section 2511(a)(2).

We next consider whether the orphans' court committed an abuse of discretion by terminating Father's parental rights to Child pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

The orphans' court concluded that involuntarily terminating Father's parental rights would serve Child's needs and welfare. Orphans' Court Opinion, 11/29/18, at 10. The court found that Child is prospering in her foster home and that an "obvious bond" exists between Child and her foster parents, who are meeting Child's medical and developmental needs. *Id.*

In response, Father makes no effort to argue that he and Child share a bond. Father's brief at 11-12. Instead, Father asserts once again that he was making progress toward remedying his drug and alcohol issues at the time the orphans' court terminated his parental rights. *Id.* Father concedes that he "may not have been following the Court Order to its exact parameters," but maintains that he was achieving sobriety nonetheless, which was more important than strict compliance with the court's directives. *Id.* Father also emphasizes that he held employment, that he was searching for housing and transportation, and that he struggled with "the extreme contentiousness of scheduling issues with OCY[.]" *Id.* at 12.

We again discern no abuse of discretion by the orphans' court. Child entered foster care shortly after her birth in February 2018 and remained in care throughout her young life. After Child entered foster care, Father's visits were inconsistent. N.T., 8/17/18, at 128, 130. When Father did attend visits, he often arrived twenty minutes to an hour late. *Id.* at 126. Moreover, Father and Child did not appear to share a parental bond. Ms. Mumford recalled that Father's visits tended to consist of playing games with Child and her siblings.

*Id.* at 141. She explained that Father and Mother "would basically act like children and just like play with [C]hildren, play with the arcade games, like it wasn't very parent/child like." *Id.*

The record describes Child's relationship with her foster parents in a more positive light. Ms. Mumford testified that terminating Father's parental rights would not have a detrimental impact on Child, because she has a very positive relationship with her foster parents and views them as her parents. *Id.* at 128. Given Child's dearth of contact with Father, it is apparent that she and her foster parents share an important parental bond. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa. Super. 2017) ("[A] child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time."). Therefore, terminating Father's parental rights will best serve Child's needs and welfare. The record supports the decision of the orphans' court to terminate pursuant to Section 2511(b).

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion or commit an error of law by involuntarily terminating Father's parental rights to Child. Therefore, we affirm the court's September 26, 2018 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/15/2019</u>